IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| DALE PESHEK, HUNG TRAN, and BRIAN THRELKELD, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>        v.<br><br>KAREN TIMBERLAKE, in her official capacity as the Secretary of the Wisconsin Department of Health Services,<br><br>    Defendant. | Case No. 21-cv-1061 |

**CLASS ACTION COMPLAINT**

Plaintiffs Dale Peshek, Hung Tran, and Brian Threlkeld, through counsel, bring this action against Defendant Karen Timberlake, in her official capacity as Secretary of the Wisconsin Department of Health Services, and allege as follows:

**Nature of the Case**

1. Plaintiffs Dale Peshek, Hung Tran, and Brian Threlkeld are three individuals who were previously adjudicated as "sexually violent persons" ("SVPs") and remanded to the custody and care of the Wisconsin Department of Health Services ("DHS"). Plaintiffs have satisfied all of the requirements for supervised release and received judicial approval for release from the Sand Ridge Secure Treatment facility. But the Plaintiffs will not be released from Sand Ridge until they have an approved supervised release plan setting forth where they will reside

while on supervised release. The Plaintiffs remain indefinitely and involuntarily detained at Sand Ridge solely because they are unable to obtain a place to reside on supervised release that complies with the onerous placement and residency restrictions contained within Wis. Stat. §980.08 (the "Statute"). Plaintiffs contend that the Statute violates their fundamental liberty interest to be free from bodily restraint and is not narrowly tailored to serve compelling state interests in public safety or rehabilitation.

2. Plaintiffs' continued detention does not arise from a single statutory restriction, but rather from the aggregate effect of multiple provisions of the Statute which in combination make it impossible for them to obtain housing.

3. First, the Statute requires Plaintiffs to obtain housing only in their "county of residence," which means they may only reside in the same county where they lived at the time of the offense that gave rise to their commitment.

4. Second, the Statute prohibits Plaintiffs from living within a 1,500-foot radius of locations including schools, churches, child care facilities, public parks, and youth centers.

5. Third, the Statute mandates that individuals convicted of certain offenses who are released from civil commitment cannot reside on a property that is adjacent to the residence of a child.

6. In densely populated counties, these requirements put almost all residential areas off limits.

7. The difficulty of securing compliant housing is exacerbated by the byzantine statutory process for obtaining approval of a release plan. In particular, the Statute requires *ad hoc* committees of local officials in each county and a DHS representative to identify housing, prepare a treatment plan, and submit the plan to the court for approval. In practice, such committees often fail to identify housing for persons being released from civil commitment because compliant housing is scarce in urban areas and the committee members often face political and community pressure to prevent the placement of releasees in community settings.

8. The Statute provides a 120-day deadline for the county committees to prepare and submit release plans for persons granted supervised release, yet in the case of each Plaintiff, this deadline has come and gone multiple times without consequence.

9. Practically speaking, the Statute creates different release times for identically situated individuals solely depending upon their county of residence. A consequence of the Statute's housing requirements is that a resident of, for example, Milwaukee County may be forcibly detained for a substantial period of time, and perhaps indefinitely, due a lack of available housing, whereas an individual from a rural area of Wisconsin may be released without undue delay.

10. Plaintiffs challenge the Statute on both a facial and as-applied basis.

## Jurisdiction and Venue

11. Jurisdiction for Plaintiffs' claims is based on 28 U.S.C. §§1331 and 1343(a).

12. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), in that a substantial part of the events giving rise to Plaintiffs' claims occurred in this district. In particular, Wis. Stat. §980.06 entrusts the DHS with the custody, care, treatment, and placement of civilly committed persons from every county in this District, and each of the Plaintiffs remains in detention because he is unable to find compliant housing in his home county in this District.

## The Parties

13. Plaintiffs Dale Peshek, Hung Tran, and Brian Threlkeld have all been involuntarily committed to the custody and care of DHS as SVPs. They are currently imprisoned in the Sand Ridge Secure Treatment Center in Mauston, Wisconsin. All are entitled to release from Sand Ridge but remain detained because of the Statute.

14. Defendant Karen Timberlake is sued in her official capacity as Secretary of the Wisconsin Department of Health Services, which is responsible for the custody, treatment and release of persons involuntarily committed to DHS facilities pursuant to Wis. Stat. §980. In her official capacity, Ms. Timberlake has final authority to apply and enforce the Statute. In particular, pursuant to Wis. Stat. §980.08(4)(f), the DHS has final responsibility for submission of a "supervised release plan" that identifies the residential address where a released person shall reside while on supervised release; and pursuant to Wis. Stat. §980.08(6m), the DHS "shall arrange for the control care and treatment" of a person who has received "an order for supervised release."

4

## Relevant Facts
*Wis. Stat. §980,* et seq.

15. Wisconsin Statute §980 sets forth the statutory criteria for the adjudication, confinement, treatment, and release of individuals who are alleged to be "sexually violent persons."

16. Wis. Stat. §980.01(7) defines a "sexually violent person" as "a person who has been convicted of a sexually violent offense, or has been found not guilty of or not responsible for a sexually violent offense by reason of insanity or mental disease, defect, illness, and who is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence."

17. Some persons who are adjudicated to be SVPs are sent directly to involuntary commitment at a DHS facility; others serve a sentence in the Wisconsin Department of Corrections and then are sent to a DHS treatment facility instead of being released onto supervision. In either event, all persons committed to DHS facilities as SVPs are involuntarily committed until they are deemed eligible for discharge or supervised release by a court.

18. An individual adjudicated as an SVP can be discharged, (*i.e.*, released from commitment without supervision or conditions), but the more common scenario is that the individual is approved for supervised release.

19. The mechanism for obtaining supervised release is set forth in Wis. Stat. §980.08(4)(cg). In order to obtain release, the individual must prove a number of factors to a court by clear and convincing evidence: that they are making significant

progress in treatment; that it is substantially probable that they will not engage in an act of sexual violence while on supervised release; that their treatment needs can be met in the community; that they can comply with the requirements of treatment and with the rules of supervised release; and that a reasonable level of resources can provide for the residential placement, supervision, and ongoing treatment needs that are required for the safe management of the person while on supervised release.

20. If an individual satisfies these criteria and a court orders their release on supervised release, this determination triggers the aspects of the Statute that are at issue in this lawsuit—namely, Wis. Stat. §980.08(4)(dm).

21. Under § 980.08(4)(dm), an individual previously adjudicated as an SVP who is subsequently granted supervised release is required to be placed by DHS in a residence in the county where the person lived at the time of the events or offense that resulted in their commitment. In the case of a county with a population exceeding 750,000 people (namely, Milwaukee County), individuals must return to their municipality (as opposed to the county) of residence. Wis. Stat. §980.08(4)(dm)(1).

22. Even after an individual has been determined by a court to be eligible for supervised release, they will remain detained involuntarily until they meet a byzantine series of requirements and criteria. To wit: (i) the individual must find a place to live in the county of their residence; (ii) the residence must not be within 1,500 feet of any school, church, child care facility, public park, youth center, or

other facility as set forth in the Statute; and (iii) a temporary committee consisting of various county and government officials in the county of residence plus a DHS representative must find and approve housing, draft a report to DHS which then prepares a treatment plan for presentation to the judge for approval or disapproval. For persons convicted of certain offenses, the residence might also be required to be 1,500 feet away from a nursing home or assisted living facility, and cannot be adjacent to a property where a child's primary residence exists. Wis. Stat. §980.08(4)(dm)(1)(b)-(c).

23. The county committees have 120 days from the court order approving a person for supervised release to prepare a treatment plan and submit a report to DHS identifying a residential placement for the individual. A county that does not fulfill these obligations violates the individual's rights as set forth in Wis. Stat. §51.61, which provides for damages of not less than $100.00 per violation. Wis. Stat. §980.08(4); Wis. Stat. §51.61(7).

24. Until the committee submits a plan that the court approves, the individual will continue to be detained. If the court rejects a plan for any reason, the 120-day deadline is simply reset.

*The History of the Statute*

25. In prior iterations of the Statute, individuals previously adjudicated as SVPs could be released to *either* their county of residence or—if good cause were found—to a different county in Wisconsin. Wis. Stat. §980.08(4)(f) (2008). In either

7

case, they would be subject to a restriction on residing within 1,500 feet of certain facilities (*e.g.,* schools, churches, daycare centers, public parks, nursing homes).

26. Under this version of the Statute, more people were released to rural counties where the prohibited locations (such as daycares and schools) were fewer in number and more geographically dispersed and there was thus more housing available outside of the 1,500-foot zones. Very few highly populated counties in Wisconsin had residences for rent that satisfied the 1,500-foot requirement, making placement in these more populated counties virtually impossible. As a result, some individuals who were previously adjudicated as SVPs were released to counties where they had no previous connection.

27. This arrangement proved unpopular with residents of more rural counties who felt that they were being used as a "dumping ground" for individuals labeled as SVPs who actually came from (or at least previously resided in) more urban areas. There was a good deal of media coverage on this issue, and constituents demanded that their representatives change the law to require that individuals be released to the county from whence they came.

28. In response to this outcry, legislators fashioned a new bill in 2017 that would require individuals previously adjudicated as SVPs to return only to their home county or city. The authors of the new bill realized, however, that this would have the effect of requiring placement of individuals back to counties where there was no compliant housing which satisfied the 1,500-foot restriction. As a legislative compromise, the legislators removed the 1,500-foot restriction in order to allow

these individuals to find compliant housing within their home counties—even if, like the Plaintiffs here, they hailed from more densely populated, urban counties such as Kenosha, Milwaukee or Racine.

29. The Wisconsin Assembly sent Governor Scott Walker a new bill that mandated SVPs be returned to their home county of residence, albeit no longer subject to the 1,500-foot restriction.

30. A co-author of the bill—Rep. Katrina Shankland of Stevens Point—summed it up by saying, "This should be about doing what's right so that everyone in the community can sleep safe and sound at night knowing that there aren't SVPs being shipped from other counties over to them without their input or approval."[1]

31. Governor Walker, for his part, wanted *both* requirements. To achieve this, he exercised a partial veto and signed into law a bill that required both the return of an individual previously adjudicated as a SVP to their home county as well as imposing the 1,500-foot restriction. This is the current Statute.

*Facts Concerning the Named Plaintiffs*

32. Plaintiff Dale Peshek, 49, was committed on June 5, 2006, to DHS following an eight-year prison term for guilty pleas to child enticement and second-degree sexual assault. At the time of his offense, he resided in Kenosha County. Since 2006, Mr. Peshek has been committed at Sand Ridge. He has proceeded through all phases of treatment and was granted supervised release under the

---

[1] *See* WSAU AM 550, *Sexually Violent Persons Bill Passes State Assembly*, available at https:// wsau.com/2018/01/18/sexually-violent-persons-bill-passes-state-assembly/ (last accessed August 12th, 2021).

9

Statute on October 18, 2019. Despite the supervised release order, Mr. Peshek has remained detained for want of available lawful housing due to the requirements imposed by the Statute. There is no clear timeline for when Mr. Peshek will be released, and thus he remains involuntarily and indefinitely detained despite being entitled to release under the Statute.

33. On July 22, 2021, a review hearing was conducted in Kenosha County Circuit Court in *State of Wisconsin v. Dale Peshek*, 2005-CI-000002. The purpose of the hearing was to evaluate the county committee's progress toward finding Mr. Peshek compliant housing at which to reside while on supervised release.

34. At the hearing, Kenosha County counsel Joseph Cardamone outlined a variety of efforts that have been undertaken by Kenosha County officials to try to locate Mr. Peshek housing: to wit, that they had tried to place a trailer for Mr. Peshek on the grounds of the Kenosha County Detention Center but ran into zoning problems; that they had similar problems with property that was owned by the county near the State line; that they found one property that appeared to meet all of the requirements and was zoned residential but that when the town's constituents discovered the plan, the property was no longer available for purchase.

35. Mr. Cardamone explained to the court, "I'm beginning to believe more and more that this process is — there's a fundamental flaw in it, which is nobody wants them in their neighborhood; nobody wants them in a residential neighborhood, so we try to move them to an area that isn't a residential area and then we're told, it's not set up for a residence, so we can't set them there either … I [] understand the

court's frustration, I understand Mr. Peshek's frustration, I understand [Peshek's counsel's] frustration. You are right, they have a right to be released under the law, but the law is written in a way that severely impedes where we can place them … it is not that the county has been sitting on its hands, doing nothing. We have been trying the best we can to work within the confines of the law."[2]

36. Kenosha Circuit Judge Mary Wagner expressed her frustration with the situation, noting that "It has to be a more aggressive approach. It has to be, we are trying to place these people in our community because they have a right to be placed, and in the meantime, their civil liberties are being denied them, and they've served their sentences, they went through the commitment, they are at the part of the commitment where they suppose[d] to be a part of the community, and be allowed to have supervised release. You couldn't do this in a prison."[3]

37. Judge Wagner ultimately ordered the county to explore the purchase of a tract of land to construct a residence for the purpose of releasing Mr. Peshek and others, noting that "the court believes, based on the representation of the county, that their efforts to purchase property, to place these individuals—this individual particularly, in a place are thwarted by political impetus of communities, and also by those statutes which currently exist for placement."[4]

38. Plaintiff Hung Tran, 51, was committed to DHS on May 8, 2007, after serving a prison term for a 1992 conviction for first-degree sexual assault of a child.

---

[2] Transcript of Review Hearing, *State of Wisconsin v. Dale Peshek*, 2005-CI-00002, July 22, 2021.
[3] *Id.*
[4] *Id.*

11

At the time of his offense, he resided in Racine County. Since 2007, Mr. Tran has been committed at Sand Ridge. On February 14, 2020, Mr. Tran entered into a supervised release stipulation with the State which was approved by the court. Under the stipulation, Mr. Tran was entitled to supervised release and agreed to be on supervised release for 18 months, but agreed to allow nine months for state officials to locate compliant housing. If housing could not be secured in that time, Mr. Tran would be entitled to petition for discharge. Approximately three months later, the county committee located potential housing for Mr, Tran, but the village where Mr. Tran was to reside objected and the plan was scuttled. In January of 2021, Mr. Tran filed for discharge pursuant to the terms of his supervised release stipulation. Shortly thereafter, he was made aware that a different potential housing site had been located for him and he voluntarily withdrew his petition for discharge on March 8, 2021. However, on May 12, 2021, the locale where Mr. Tran was to be placed objected and the court ordered that the placement was not appropriate, which started the search for housing over once more. Despite being entitled to release, he remains involuntarily and indefinitely detained at Sand Ridge.

39. Plaintiff Brian Threlkeld, 40, has been at Sand Ridge since October 2008 and was formally committed on March 26, 2009, following a prison term for a 2000 conviction for second-degree sexual assault of a child. At the time of his offense, he resided in Kenosha County. Mr. Threlkeld has completed treatment and petitioned for discharge on December 10, 2019. On February 4, 2020, he entered into a

supervised release stipulation with the State that was approved by the court on February 17, 2020. Pursuant to that stipulation, he could petition for discharge if housing was not located within nine months. More than a year later, Mr. Threlkeld was notified that the county committee had located housing for him in the Village of Trevor. A week before Mr. Threlkeld's release, the Village had a meeting and notified the sheriff that a "park" was within 1,300-feet of the proposed residence. On information and belief, the park is nothing more than a vacant lot and is separated from the proposed residence by a body of water. On May 28, 2021, the court declared that the proposed residence was not compliant and ordered the preparation of a new plan. Mr. Threlkeld has supportive family in Kenosha, though he is unable to reside with them due to the housing restrictions imposed by the Statute. Mr. Threlkeld remains detained at Sand Ridge for want of compliant housing.

40. In the case of all Plaintiffs, the committee formed under the Statute had 120 days from the original supervised release orders to find compliant housing and submit treatment plans, but has failed to do so for want of available lawful housing. As of September 1, 2021, 684 days have elapsed since Mr. Peshek was granted supervised release, 565 days in Mr. Tran's case, and 562 days in Mr. Threlkeld's case.

41. Pursuant to the Statute, Plaintiffs Peshek and Threlkeld must be released to Kenosha County, where they resided at the time of their offenses. Plaintiff Tran must be released to Racine County.

13

42. The prolonged detention of people previously adjudicated as SVPs and granted supervised release is not a new phenomenon in Wisconsin. In fact, the systematic deprivation of their civil rights has been occurring for more than two decades. *See, In re Alternative Placement of Morford*, 724 N.W.2d 916, 918 (Wis. Ct. App. 2006) ("Attempts to locate permanent suitable residential placement for Morford have now been presided over by at least five different judges for seven years. Searches have been conducted, consultants hired and fired, money appropriated and unspent, committees appointed and public hearings held. To date, no suitable permanent residential placement has been located."); *In re Commitment of Schulpius*, 707 N.W.2d 44 (2006) (noting that years-long delay in placing individual on supervised release after he was ordered placed on supervised release violated procedural due process rights).

**Class Allegations**

43. Plaintiffs seek to represent a class of similarly situated individuals for the purpose of obtaining injunctive relief under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

44. **Class Definition**. The class shall be defined as:

All persons who have been adjudicated as SVPs under Chapter 980 of the Wisconsin Statutes who are involuntarily committed at a DHS facility and who have been approved for supervised release under Wis. Stat. §980.08 but who have not been released due to an inability to locate compliant housing.

45. All members of the proposed class were and are similarly affected by the Statute's residency requirements.

46. **Numerosity**. On information and belief, Plaintiffs' counsel believes that there are at least 40 people who are currently or will in the future meet this class definition. Membership in the class is constantly changing as additional people are approved for release, making joinder of all class members impracticable, if not impossible.

47. **Common Questions of Law and Fact Predominate**. There are questions of law and fact common to all members of the proposed class, including but not limited to the following:

- Whether individuals granted supervised release from civil commitment have a liberty interest in release to a community setting after receiving an order granting the supervised release;

- Whether the requirements imposed by the Statute serve a compelling government interest;

- At what point does detention of an individual for the purpose of identifying compliant housing amount to a denial of substantive due process;

- To what extent compliant housing exists in Racine, Kenosha, and other counties in Wisconsin; and

- Do the residency restrictions and approval processes imposed by the Statute effectively prevent individuals from more populous counties from ever being released despite their liberty interest in release to a community setting.

48. **Typicality**. The facts surrounding the involuntary confinement of the Plaintiffs are typical of what happens with the other members of the proposed class. That is, most persons who remain detained at Sand Ridge after being granted supervised release come from densely populated counties where residences that

comply with the Statute's restrictions are scarce. The law affects all of them equally.

49. **Adequacy**. Plaintiffs have no conflict of interest or unusual fact pattern that would render them inadequate class representatives. Plaintiffs are represented by counsel who are experienced in civil rights class actions generally and class actions on behalf of persons with past sex offense convictions who are being held in custody due to a lack of compliant housing in particular. *See, e.g., Murphy et al. v. Raoul*, 16-cv-11471 (N.D. Ill.); *Barnes, et al., v. Jeffries*, 20-2137 (N.D. Ill.).

50. The challenged Statute applies generally to all members of the class, so that the final injunctive relief and corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I
## Fourteenth Amendment – Substantive Due Process

51. Plaintiffs reallege and reincorporate, as though fully set forth herein, each and every allegation above.

52. The Statute's restrictions, including that a person previously adjudicated as an SVP must go back to his or her home county, the 1,500-foot prohibited zones, and subjecting housing to the approval of local committees, creates an untenable and unconstitutional restraint. Plaintiffs are unable to find housing and will likely be forced to spend the rest of their lives in involuntary detention waiting for housing that will never become available.

53. The Statute has the effect of holding persons in custody for an indeterminate period of time after they have already demonstrated to a court that they meet the requirements for release under the Statute.

54. The right to liberty is fundamental and therefore any restraint on that liberty is subject to strict scrutiny. In fact, the right to be free of government custody, incarceration, and restraint is at the heart of the liberty interest protected by the Fourteenth Amendment. *See Zadvydas v. Davis*, 533 U.S. 678 (2001). Wisconsin can only restrict this fundamental right of liberty if it has a compelling governmental need for doing so.

WHEREFORE, Plaintiffs respectfully requests that this Court grant the following relief:

    A. Enter a declaration that the Statute is unconstitutional and violates the Fourteenth Amendment on its face and as applied to Plaintiffs and the members of the class;

    B. Enter a preliminary and then permanent injunction prohibiting Defendant from enforcing the Statute;

    C. Enter judgment for reasonable attorneys' fees and costs incurred in bringing this action pursuant to 42 U.S.C.§1988; and

    D. Grant any other relief as law and justice demand.

## COUNT II
**Fourteenth Amendment – Equal Protection**

55. Plaintiffs reallege and reincorporate, as though fully set forth herein, each and every allegation above.

56. The Statute creates unequal treatment of similarly situated persons. Someone who was previously adjudged as an SVP and whose offense was committed

in—for example—Marinette County will be released earlier than a person required to be released to Kenosha County or the City of Milwaukee simply because of the dumb luck that there is more available housing in some areas of the State versus others.

57. The effect of this scenario is that two individuals granted supervised release with identical records, identical histories, and identical sentences could have radically different outcomes in terms of obtaining release from DHS custody depending solely on where they lived at the time of their offense.

58. Neither the Plaintiffs nor any member of the class, the courts, or DHS has any control over the availability of compliant housing within a given county.

59. Where, as here, a legislative classification impinges upon an affected group's "exercise of a fundamental right," the government must prove that "the classification has been precisely tailored to serve a compelling governmental interest." *Plyler v. Doe*, 457 U.S. 202, 217 (1982).

60. Simply stated, there is no compelling governmental interest that is served by indefinitely and arbitrarily detaining individuals who have been approved for release due to the accidental fact of whether they hail from a rural part of the state versus a more densely populated part of the state.

WHEREFORE, Plaintiffs respectfully requests that this Court grant the following relief:

    A. Enter a declaration that the Statute is unconstitutional and violates the Fourteenth Amendment on its face and as applied to Plaintiffs and the members of the class;

B. Enter a preliminary and then permanent injunction prohibiting Defendant from enforcing the Statute;

C. Enter judgment for reasonable attorneys' fees and costs incurred in bringing this action pursuant to 42 U.S.C.§1988; and

D. Grant any other relief as law and justice demand.

Respectfully submitted,

/s/ Mark G. Weinberg
/s/ Adele D. Nicholas
*Counsel for Plaintiffs*

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-3913
mweinberg@sbcglobal.net

Law Office of Adele D. Nicholas
5707 W. Goodman Street
Chicago, Illinois 60630
(847) 361-3869
adele@civilrightschicago.com